## COURT OF APPEALS, JUNE TERM, 1797.

### SOMERVILLE *et al.* vs. TRUEMAN's Devisees.

APPEAL from a decree of the court of chancery dismissing the bill of complaint.

The bill was filed on the 23d of September, 1785, in the names of *James Somerville* and *Ann* his wife, against *Benjamin Trueman*, and stated, that *Edward Trueman*, being seised of parts of two tracts of land called "*Black-*

well." and "*Thomas and Anthony's Choice*," lying in Prince George's county, sold the same in fee to *Thomas Trueman* in 1717, for 50*l.* sterling, which was paid by *T. Trueman*, who died before any deed was executed:— That *T. Trueman*, by his will dated the 15th of September, 1717. devised this land to *James* his son, describing it as land bought from *E. Trueman* his brother. That *E. Trueman* on the 23d of July, 1720, executed the deed exhibited to *James Trueman*, agreeably to the directions of the will of his father, which deed was not recorded, conveying to him in fee 250 acres of land, under particular descriptions, with general warranty, and covenant for further assurance. The land is conveyed by the name of *Blackwell*, the courses in reality take in the land bought by *Thomas* from *Edward Trueman*, called *Blackwell* and *Thomas and Anthony's Choice*. That *James Trueman* died in 1743, having devised this land to *Thomas Trueman*, the father of *Ann M. Somerville*, one of the complainants, who died, leaving the said *Ann* his heir at law. That *Thomas Trueman* was the heir at law of *James Trueman*, and that *James Somerville* is married to *Ann*. That *Edward Trueman* is dead, and *Benjamin Trueman* is his heir at law, who claims the land by reason of the defective deed. That *Benjamin Trueman*, and *Thomas Trueman* the father of *Ann*, agreed to refer the dispute, and accordingly, by bond dated the 3d of December, 1770, it was referred to *Charles S. Smith*, *Joseph Sim*, *William Bowie* and *Henry Tubman*. That it was afterwards agreed that *Smith* should not act; and that *Sim*, *Bowie* and *Tubman*, on the 8th of April. 1771, awarded, that *Benjamin Trueman* should convey to *Thomas Trueman*, according to the deed before mentioned. That *Benjamin Trueman* did not convey, and has brought an *ejectment*. INJUNCTION prayed, and that the defendants be compelled to execute a deed, &c.

THE ANSWER of *Benjamin Trueman* admits, that at and before the year 1717, *Edward Trueman* was seised of the land called *Blackwell*, and *Thomas and Anthony's Choice*, and died seised in 1729. That the defendant is his son and heir at law. The defendant does not know of, or believe, there was any contract for the land between *Edward*, and *Thomas Trueman*, the elder. He does not know or believe that *Thomas Trueman* paid any money, or any thing valuable for the same, or that *Edward* owed him any money. He does not know or believe that *Edward Trueman* ever executed any deed for the land to *James Trueman*, the devisee of *Thomas*. He has understood from *general reputation*, that his father married a second wife, who after his death married *John Lawson*; and that *Lawson* and his wife gave *James*

*Trueman* the possession of the *northernmost* part of the two tracts, on account of a debt claimed by *James Trueman* against *Edward Trueman*; the defendant was about 14 or 15 years old. That in 1759 the defendant sold the southernmost part of the land to *Hoxton* and *Digges*, and from that time till 1770, lived on a plantation of *John Perrie*; in that year he took possession of a house, and the land part of *Blackwell* and *Thomas and Antho-ny's Choice*, and has lived there ever since. He has been frequently asked for a deed, but no evidence of any contract was ever shewn, until *Thomas Trueman*, not many years ago, shewed him the deed before exhibited. He always refused to convey. The answer then states, that the family of *Thomas Trueman* were always endea-vouring to impose on him. He states some instances, and some letters, from June 1760 to 1768. He also states the manner in which the ancestors of the com-plainants have claimed the location of the land. He states an instance of ill usage by *John Perrie*, in 1770, the whole of which is considered as unnecessary to be sta-ted, as being entirely irrelevant to the case. That after those transactions, 1770, *Thomas Trueman* attempted to burn his house, and through duress he executed the bond stated in the bill. That he did object to *Charles S. Smith* having any thing to do with the arbitration; but he never consented to the other arbitrators acting, but always denied their authority. He admits that *Ann* is the heir of *Thomas Trueman;* he does not admit the wills of *James*, or *Thomas Trueman* the elder. He ad-mits the complainants, *James* and *Ann*, are married;— and that *Joseph Sim* and *William Bowie* made the award; but he does not believe that *Tubman* was present when the award was made, and he *does not* know whether he signed it.

DURING the pendency of the suit, *Ann Somerville*, one of the complainants, and *Benjamin Trueman* the de-fendant, both died. The original bill was by order of the chancellor and consent of counsel amended, by in-serting the names of the heirs of *Ann Somerville*; and at May term 1790, the proceedings were revived against the devisees of *Benjamin Trueman*.

The counsel for the appellants, having in his argu-ment before the court of appeals, stated very fully the testimony which was taken in the case, the Reporters deem it unnecessary to make any other statement.

HANSON, *Chancellor* (December term 1794) " There are such peculiar circumstances in this case, that the chancellor conceived it probable a decision of arbitra-tors, appointed by order of the court, with the consent

of the parties, which would not operate as a precedent for the future determination of this court, or of any other regular standing tribunal, would not only be most likely to end all controversies, but place matters on a footing the most fair and proper, independent of law or the jurisdiction and established principles of this court. He therefore proposed an order of reference. As the parties have declined the proposition, it is now incumbent upon him to pass such decree as appears to him consonant to the settled principles of this court.

The application of the complainants appears to rest on three several grounds.

1st. That a defective conveyance hath heretofore been made, and that it is the business of this court to aid the defect.

2d. That an agreement was formerly made between the ancestors of these parties; and that as every thing has been done on the part of the complainants, an execution of the contract on the part of the defendants ought to be enforced by this court.

3d. That a submission to arbitrators was formerly entered into by the said ancestors, and that the defendants ought to be compelled to perform the award then made.

1st. As to the first point it may suffice to distinguish between the defects *in*, and the defects *of* a conveyance. Where a deed has been completely executed, but there has been a defect *in* the body of it, arising from a mistake, or omission, a court of equity hath sometimes supplied the defect; but where the execution has *been* incomplete, this court hath never granted relief, unless on consideration of a fair, just, and valid agreement, in pursuance whereof the deed was intended to be executed; and this leads to the second point.

2d. Some limitation of time, within which suit must be brought for specific performance, is certainly proper. It is said that the agreement, which is stated to have been made at least sixty or seventy years ago, has been fully performed on both sides, except only the complete execution of a deed. This undoubtedly ought to be the case, if the lapse of time is not to operate as a bar. But on this head, the proof on the complainant's side is defective; part of the conduct of their ancestor has been inconsistent with such an agreement; and the possession, which is said to have been gained in consequence thereof, has been at least as well accounted for in another way. In short, the chancellor's conscience is by no means satisfied that there was such agreement; that every part of it has been performed on the side of the complainants; and that it would be proper for him to make a precedent by decreeing a specific performance by the defendants.

3d. As to the third point there is not the least colour for its support. This court never has decreed the performance of an award, unless on consideration of a subsequent agreement to perform it. Suppose even (what is not the case) the award established, as it ought to be, there is not the slightest proof of such subsequent agreement. The fact is, that no such award hath been produced, nor is it stated in the bill that it has been lost. Had that been the case, nothing can be more clear, than that a man, by loosing a deed or instrument of writing, could not be entitled to a greater relief than he would have been entitled to before the loss. If the court should grant relief at all in such a case, it would probably direct an issue to ascertain damages, &c.

June, 1797.
Somerville.
vs.
Trueman.

A number of points, each of which is defective, are frequently supposed to produce something when taken collectively. But the *idea* is repugnant to reason, and can never be countenanced in a court of equity more than in a court of law.

Whether or not a bill of revivor lies against a devisee, the chancellor is at present under no necessity of deciding. The point may possibly be hereafter made in some other cause, and in this cause it hath not been argued.

Upon the whole, it is, this 14th January, 1795, adjudged, &c. that the bill of the complainants be dismissed, and that the injunction, &c. be dissolved, &c.

The complainants appealed to the court of appeals, and the case was argued in this court by

*Kilty* and *Shaaff*, for appellants, and by

*Key*, for the appellees.

*Shaaff* for appellants. This cause has every honest claim to the intercession of a court of equity for relief; and I trust, that upon an accurate consideration of it, there will be found no principle of law, equity or reason, to prevent the appellants from a recovery. It would be a great reflection on our laws, if a man had no mode of gaining title to land, which his ancestor had bought and paid for; a deed executed in conformity to the purchase, but by accident defective; an uninterrupted possession of the greatest part of it from the year 1717 to this period; and an award of arbitrators, mutually chosen, in his favour, together with a descent through four generations. Yet those are the facts which the proceedings in the cause unquestionably prove, and on which the decree of the court of chancery has been given against the title of the complainants in the court below.

For the sake of uniformity, I will pursue this subject in the same manner the chancellor has done in his decree,

by stating, that the complainants application rests on three grounds.

*First.* That a defective conveyance has been made, and it is the business of this court to aid its defects.

*Second.* That a contract was formerly made for the land in question, between the ancestors of the parties, and a full compliance on the part of the complainants, and that an execution of the contract ought to be enforced.

*Third.* That there has been a submission to arbitrators formerly entered into by the said ancestors, and an award made, and that this court ought to enforce an execution of the award then made; and

*Fourthly,* I will consider if the lapse of time will prevent a recovery.

1. THE *first point,* as to the fact of the deed being executed by *Edward Trueman:*—It seems not to be questioned by the chancellor in his decree; indeed the thing is proved beyond all question by the depositions, although the defendant, *(Benjamin Trueman)* in his answer does *not* admit it, but endeavours to evade that point of the bill, by saying that he does not believe it was executed by his father.

THE EVIDENCE as to the execution of the deed: *James Trueman* proves *Edward Trueman's* signature to the deed by a comparison with the signature of *Edward Trueman* shewn him, and acknowledged by the defendant himself.

*James Collins* proves the hand writing of *Thomas Gantt,* one of the instrumental witnesses.

*Thomas Gantt* proves the hand writing of *Thomas Gantt* and *Levin Covington,* the two subscribing witnesses.

The evidence of those three witnesses, together with the circumstance of the possession going along with the deed, beyond all doubt proves the existence of the deed. The only question is the effect and operation of it.

One great ground of the jurisdiction of a court of chancery, is to relieve against accident and mistake, thereby to prevent the failure of an honest contract, on account of any omission or accident in the formal execution of it. This rule equally holds, whether the mistake exists in the body of the conveyance, or in the mode of its execution, because certainly there is the same necessity for relief in one case as in the other.

The authorities and adjudged cases certainly warrant the principles which I have laid down.

2 *Com. Dig.* 171. If a farm is conveyed as lying in *A,* when it lies in *A* and *B,* and the party has declared that he has conveyed such a farm, it shall be so decreed. Cites 2 *Ca. Ch.* 68.

So if in the conveyance the word *"Heirs"* is omitted; so if part of the land intended to be conveyed is omitted; so if more land is inserted than is intended to be conveyed; Cites 2 *Vent.* 345.

In these instances, and many others which could be mentioned, the defect has arisen not from any formal defect in the execution of the conveyance, but on account of some omission or mistake in the body of the instrument.

But relief is equally granted in those cases where the deed is defectively executed.

It is laid down in the case of *Fothergill and Fothergill,* 2 *Freem.* 256, and 1 *Eq. Ab.* 286, that a conveyance, on good consideration, though defectively executed, equity will supply the defect. As in the cases of feoffment without livery, a conveyance of a copyhold, where there is a defective surrender. In those instances the ceremony of livery, or a surrender, was essential to the perfection of the conveyance in point of law, yet they were supplied by a court of equity.

Every species of defect in the execution of a deed, may be relieved against in a court of equity, provided the contract is fair and honest; and a number of instances are collected in 2 *Com. Dig.* 171, the whole of which it is unnecessary to enumerate.

*LeNeve vs. LeNeve,* 1 *Vez.* 64. In that case *LeNeve,* on his first marriage, settled land to particular purposes, but the conveyances were never registered according to act of parliament. His first wife died, and he made a second settlement, and it was regularly registered, but the trustees and parties concerned had full notice of the first settlement. Lord *Hardwicke* decreed, that the second settlement should be postponed to the first; and that the trustees should convey accordingly; and cites three cases where the point had been solemnly decided.

This case fully establishes the point, that the want of registering is one of those defects which the court will relieve against; because the chancellor decreed a conveyance which wanted that solemnity to be perfected, against a person who had notice of that defect.

2 *Com. Dig.* 171, and 1 *Cha. Rep.* 10. Equity will aid a bargain and sale which is not enrolled.

From these cases it is clearly proved, that it is the practice of a court of chancery to supply the defects of a conveyance, not only such as arise from omissions and mistakes in the body of the deed, but also those which proceed from an error in the execution. And these authorities also prove, that there is no solidity in the distinction mentioned in the decree, between the mistakes *of,* and the mistakes *in* a deed. In both cases the court

will alike give relief, because a court of equity does not regard the form of a conveyance; but wherever the contract of the parties can be discovered, it will enforce the execution of it; and although a deed is defective to pass the legal estate, yet it will be evidence of the contract.

The deed is in the bill stated to be defective, First, because the land contracted for was called *Blackwell*, and *Thomas and Anthony's Choice*, and the deed expresses to convey only *Blackwell*, although *courses* comprehend the whole of the land purchased.

It strikes me most forcibly that this in point of law, is no legal objection, because where there are two descriptions used, that one shall prevail which shall carry into effect the intent of the parties; and that in this case the description of the land, by metes and bounds, would be sufficient to carry the land according to that description (a). But should it be considered as a legal objection to passing the whole land, it is still one of those defects which a court of equity ought to have relieved against.

The case in 2 *Com. Dig.* 171, taken from 2 *Ca. Ch.* 68, is exactly in point. There land was conveyed as lying in *A*, when it laid in *A* and *B*, and the court of chancery rectified the error.

But the great defect in the deed is, that it was executed in 1720, and not recorded until 1771. The deed also is signed and executed before the magistrates, but there is no certificate of the acknowledgment. From the objections it is certainly inoperative to pass a legal estate.— However, it is equally certain that it is one of those defects which a court of equity will relieve against.

The case in 1 *Vez.* 64, and 2 *Com. Dig.* 171, taken from 1 *Cha. Rep.* 10, is fully in point on this subject, proving that the want of recording a deed is one of those defects which will be relieved against. And every principle extends to the want of the acknowledgment of a deed.

Having established that the defects in this deed are such as a court of chancery will generally aid—it is next to be considered whether this is such a case as the court will lend its assistance to. Although the court has the authority to aid the defects of a deed, yet there are many instances in which a court of equity would, and ought to refuse to interpose; as if the conveyance was *voluntary, or if it was fraudulent*. But no principle of equity can be more fully established, than that the court will aid the defect of a conveyance in favour of a purchaser, and also in favour of creditors, a wife and children.

The chancellor's decree itself seems to admit, that in case of a fair, just and valid agreement, and a defective

(a) See *Hawkins vs Hanson, Ante* 1 *Vol.*

deed executed in consequence of it, that the court would interpose. It is conformable to sense and reason that it should be so, and all the authorities before cited prove that a purchaser is emphatically one of those descriptions of persons in whose favour relief will be granted.

In 2 *Freem.* 256, and 1 *Eq. Ab.* 286, the court determined that the defect would be supplied in case of an agreement on a good consideration.

In 1 *Vez.* 64, the defect was supplied in the case of a marriage settlement, in which cases the parties claiming under them are considered purchasers in equity. The same in 2 *Com. Dig.* 171, and 1 *Cha. Rep.* 10, where the defect of enrolment in a bargain and sale was supplied.

In 2 *Vernon,* 165, the court said there was no doubt but that in the case of a *purchaser* the want of a surrender would be supplied.

In 1 *Atkins,* 561, the court declared that a defective execution of a power will be supplied as well in the case of younger children, and provision for a wife, as in favour of *purchasers* and creditors. Indeed, although there has been some doubt what other description of persons would be entitled to relief, there never was any doubt but that a purchaser was one of the favoured persons.

I shall now contend, that the appellant's ancestor, *James Trueman,* was a fair purchaser for a valuable consideration. To prove this the deed before mentioned is the strongest evidence. A man's deed is always considered as the strongest evidence against himself; and the deed being fully proved to be the act of *Edward Trueman,* it is evidence to a demonstration that the facts contained in it are true. The deed therefore proves that *Edward Trueman* was actually paid, or had secured to him 50l. by *James Trueman's* father, in consideration of which he executed the deed.

The will of *Thomas Trueman,* the elder, states, that he had bought the land from *Edward Trueman,* and paid for it, and directs a conveyance to *James Trueman* his son.

What evidence can be stronger than the present? *Edward Trueman's* will is dated in 1717; this will devises the land to *James Trueman,* and states a payment of the purchase money. This instrument is conclusive on all the representatives of the testator.

Three years afterwards, in 1720, *Edward Trueman,* knowing the truth of what was stated in the will, and like a virtuous man, intending honestly to comply with his engagement with his brother, executes a deed, acknowledging the receipt of the purchase money, and conveys (as he supposed) the land to *James Trueman* the devisee in the will.

This deed, although defective in its execution so as to pass the legal estate, is very proper evidence of the contract of the parties. It can be hardly necessary to cite authorities to prove what appears to be so consistent with sense and reason.

*Loft's Evidence*, 462. A deed defective as an indenture may be good evidence of a parol agreement.

It may be proper to remark here, that this deed of *Edward Trueman* differs from ordinary deeds, in which there is simply an acknowledgment of the purchase money, because here the deed acknowledges the consideration of 50*l.* from the father of the grantee, which will certainly amount to evidence of that fact, under the hand and seal of the party.

There have been determinations of courts of chancery to this effect.

*Annomdale vs. Harris*, 2 *P. Wms.* 432. The chancellor held, that a recital in a deed that the party had given a bond, is sufficient evidence of that fact; that it is a confession of the party himself; and stronger than a verbal confession, being under his *hand and seal.*

The parol evidence in this case strongly corroborates the written evidence produced. First, The uniform possession in the ancestors of the appellants from 1717 to this time, being a period of 80 years; then the evidence respecting the purchase between *Edward* and *Thomas Trueman*, the original ancestors of both; the particulars of which evidence, on both these subjects, are collected in the consideration of the second branch of this case, to which may be added the opinion of the arbitrators, men of character and respectability. If this is not sufficient evidence of a contract made so far back as the year 1717, it will be wholly impossible, in a court of justice, by any species of proof, to establish a fact of so remote a period; for I do presume that stronger evidence of a transaction, happening 80 years ago, could in no instance be obtained.

Courts have always paid great respect to *old deeds*, and papers of parties. This being an *old* deed is evidence without proving it, *possession* having gone along with it, and very properly, because the presumption is, that if the deed was fraudulent, the possession would have been contested; so in the present case, where the possession has followed the deed from 1717 until a few years ago, when the ejectment was brought, the court will intend that the deed was fair and honest, and on a valuable consideration, as is expressed in the body of the deed.

The consideration of the deed is 50*l.* sterling; the land purchased is 250 acres, uncultivated, as appears

by the deed itself, being stated to be in the woods, and I presume that 50*l.* sterling will, so far back as 1717, be found to be a full consideration for that quantity of uncleared land.

I have made the observations on the first division of this subject, which I think fully establish that the appellants are entitled to the aid of a court of chancery to supply the defects of a conveyance made to their ancestor, *James Trueman*, upon the ground that they are the descendants of a fair purchaser, for a valuable consideration, and as such entitled to the assistance of a court of chancery to supply the defective execution of a deed made to their ancestor. I will now consider

2. The *second point*—That a contract was formerly made for the land in question between the ancestors of the parties, &c. &c.

Upon this ground the application is to a court of equity to compel the specific performance of a contract which has been fully executed on the part of the complainants, under the admitted power which a court of that kind possesses, of compelling the party specifically to carry into effect his contract, and not compel him to seek damages in a court of law.

If the complainants have established in evidence a contract for the sale and purchase of the land in question, and a compliance on their part, they certainly are entitled to a decree for a specific performance of the contract, if not barred by some other circumstance.

I shall be able to prove that the contract was made and performed on the part of the complainant's ancestor. *First*, By proof of the facts, independent of possession. *Secondly*, By proving a continued possession for 80 years.

*First*. As to the proof independent of possession. The first fact which is proved in the will of *Thomas Trueman*, the elder, made so far back as the year 1717, in which he devises the land in question to his son *James*, expressly stating it to be the land bought of *Edward Trueman* his brother, but had not been conveyed, and directed the land to be conveyed to his said son *James*.

This circumstance, in a transaction so far back as 1717, ought to have great weight in the establishment of the point in dispute, and when attended with the other facts disclosed, is of much importance.

In the year 1720 a deed was made by *Edward Trueman* to *James Trueman*, for the same land, and to the very same person, directed by the will of *Thomas Trueman*; and in the body of the deed the consideration money is acknowledged to have been received from *Thomas Trueman*, the testator, himself.

This deed, in all probability, from the date of it, was made at a time when the whole transaction was completely in the mind of *Edward Trueman*, and when he was fully impressed with the justice of his brother's right. What stronger evidence can there be of a contract to convey, than the person selling the land executing a deed to the very person appointed to receive it by the party purchasing? In my judgment no proof can be stronger. *James Trueman* was not the only son of *Thomas Trueman*; for the will states he had an elder son named *Henry*; and no reason can be assigned why *Edward Trueman* should execute a deed to *James Trueman*, but the true one; that he had sold the land to *Thomas Trueman*, and that the deed was made to his devisee *James*, from whom he acknowledged to have received payment in the deed itself.

The effect of this deed has been considered in the first ground of relief; but it must be observable, that although as a defective conveyance it may form a substantive ground of relief, yet it may be very good evidence of a contract to be specifically carried into execution.

The parol evidence taken in the cause seems to corroborate the written proof.

*James Trueman*—Has often heard that *Edward Trueman* sold *Thomas Trueman* 250 acres of land of the north part of *Thomas and Anthony's Choice*, and *Blackwell*. He was present at an arbitration between *Thomas Trueman* and *Benjamin Trueman*, when *Richard Brightwell*, then 80 years old, swore before the arbitrators, that *Edward Trueman* acknowledged he had sold his land to *Thomas Trueman*, and was paid for it.

*Mary Venables*—Has heard *John Brightwell* and *Joseph Lukworth* say, that *Edward Trueman* sold the land and was paid for it, but never conveyed it.

*Samuel Cave*—Has heard it frequently, but cannot tell from whom, that *Edward Trueman* sold *Blackwell* and *Thomas and Anthony's Choice*, to his brother—was paid for it, but never made it over.

*James Collins*—Has heard *Henry Trueman* say, that his father *Thomas Trueman* had bought the land where *Russell's* quarter was, from *Edward Trueman*, and that *Benjamin Trueman* had promised to convey the land to *Ann Somerville's* father. That *Russell's* quarter is a part of *Blackwell* and *Thomas and Anthony's Choice*.

*Richard Brightwell*—Has heard that *Edward Trueman* sold land to *Thomas Trueman* his brother, but does not know what land. Has heard his father, *Richard Brightwell*, repeat a conversation between *Thomas* and *Edward Trueman*, in which *Edward* acknowledged that

he had sold part of his land to *Thomas*, who had paid for it.

The depositions of all these witnesses fully prove what was the opinion of all the cotemporary neighbours of this transaction; all coinciding in a belief that the land was bought by *Thomas Trueman*, the elder.

The evidence of *James Trueman* on this subject, it is apprehended, is strictly legal, declaring what a witness (*Richard Brightwell*) swore on a trial by arbitration between those under whom both parties claim, and coming under the principle of permitting evidence to be given of what a witness swore at a former trial between the same parties, where the witness is dead.

The *second* part of this ground of relief will now come under consideration.

The evidence as to this part of the case is most full and conclusive, and proves a continued possession of all, but a small part of which *Benjamin* took possession, ever since the death of *James Trueman*, to whom it was intended to be conveyed by *Edward Trueman*, the original proprietor.

THE EVIDENCE as to the point of possession. *James Trueman*—knows that the northernmost part of the two tracts of land in dispute was in possession of *Henry Trueman*, as guardian to his son *Thomas*, to whom it was willed by his uncle *James Trueman*. That after the death of *Henry Trueman*, *Ann* his wife kept possession of the land until *Thomas* came of age, who then took possession himself. He states that the land was made over to *James Trueman* when he was a minor; that his mother kept possession until he arrived of age, and that then *James* took and kept possession as long as he lived, and willed it to *Thomas* as before mentioned. That about 18 years ago *Benjamin Trueman* took possession of the north tenement, broke into the house, &c. That he paid assessment on the land as guardian to *Ann M. Somerville*, one of the complainants. That after *Thomas Trueman* had taken possession of the land, he threatened to sue *Brightwell* for a tract of land called *Spinnum*, taken up in *Thomas and Anthony's Choice*. *Brightwell* gave up the land to *Thomas Trueman*, and paid a milled shilling rent.

*Alexander Trueman*—As long as he can remember, which was about 30 years, *Thomas Trueman* had possession of the land in dispute. He rented a part of the land of *Thomas Trueman* for one year, 1776, and paid 1000lb. tobacco rent. That about 19 years ago *Benjamin Trueman* took possession of the north tenement by force.

*Mary Venables*—That *Thomas Trueman* got possession of the land from his uncle *James Trueman,* and continued in possession until she left the place, about 20 or 21 years ago. She was tenant for 12 years of that part of the land called *Blackwell,* and *Thomas and Anthony's Choice,* which is now in dispute, and paid 800lb. c. tobacco, rent, to *Thomas Trueman.* That *Benjamin Trueman* took possession the same day she left it.

*Samuel Cave*—His brother *Thomas Cave* rented the land in dispute, where *Benjamin Trueman* lives, of *Henry Trueman,* about 30 or 40 years ago.

*James Collins*—The land in dispute has been in the possession of *Thomas Trueman's* heirs ever since he can remember; they held peaceable possession before *Henry Trueman's* death. That *Benjamin Trueman* never set up any claim until after *Henry Trueman's* death. He was acquainted with *Benjamin Trueman* about 50 years. He always lived near the land. That *Henry Trueman* took out a commission to prove the boundaries of the land, but nothing was done.

*Richard Brightwell*—Remembers that *James Trueman* built a house and settled negroes at the place where *Benjamin Trueman* lives, about the year 1739. At the request of *Thomas Trueman* he served a warrant on *Benjamin Trueman,* who agreed to pay rent to *Thomas.*

*William Watson*—Heard that *James Trueman* built a house where *Benjamin Trueman* now lives, and held it until he died.

*William Watson, junior*—*James* Trueman held the land until he died 45 years ago. *Henry Trueman* held it for his son *Thomas,* and after his death his wife held it for him; when she died, *Thomas Trueman* held it.

*Thomas Gantt*—In 1778 he and *Alexander H. Magruder* issued a warrant of forcible entry against *Benjamin Trueman* at the instance of the executors of *Thomas Trueman,* and by a jury put them into possession.

The above is an abstract of the depositions as to the fact of possession of the land in dispute, being in the ancestors of the complainants, and it is impossible to conceive more full evidence of possession.

The possession is proved to have commenced about the year 1720, by proving a possession in *James Trueman,* by his mother holding for him during his minority, and his having a deed for the land while he was a minor, and this deed is dated in the year 1720. See the deed exhibited, and the deposition of *James Trueman.*

Possession is proved in *James Trueman,* and in *Thomas* his heir, by his guardians *Henry Trueman* and his wife. See the depositions of *James Trueman* and *William Watson, junior,* &c. It is proved that different te-

nants paid rent for the land to the heirs of *Thomas True-*

*man.* It is also proved that *James Trueman* built a house in the year 1739, and settled a quarter of negroes, on the very place where *Benjamin Trueman* himself lived; and it is also proved, that in 1778 the representatives of *Thomas Trueman* had the finding of a jury, and the judgment of two justices, sitting to determine a writ of forcible entry in favour of their right of possession.

From the evidence in the cause (and the credit of the witnesses is not impeached) how can there remain a doubt on the mind of any man, but that the possession has been in the complainant's ancestor, of the greater part of the land, down to this period, and of the whole of it, until about 19 or 20 years before the taking of the depositions, which was in 1789.

The defendant, in his answer, does not state that he ever had possession of all the land in dispute, but that in the year 1770 he took possession of part. This is also proved by the depositions, which state that about 49 years before the time of taking them, which will bring it to about 1770, he forcibly took possession by breaking doors, and locks, which is an additional proof of adverse possession.

I observe, the chancellor in his decree has stated, that the possession of the complainant's ancestors has been as well accounted for in another way. It is impossible the chancellor could have meant that the defendant by proof had accounted for the possession of the complainants, because the whole proof is directly the reverse; he must have alluded to the answer of *Benjamin Trueman,* by which he states, that by general reputation he has understood that *Lawson* and his wife gave possession of this land to pay a debt with.

The answer of a defendant, however positive it is, may be contradicted; and the contrary of this part of the answer is most completely established by the evidence in the cause; but the answer does not state the fact, not even that he believes it, but only that from *general reputation* he has *understood* so; and it would be strange if such loose allegations should be competent to defeat a man's claim in a court of equity or in a court of law.— *Benjamin Trueman* seemed sensible of the title of the representatives of *Thomas Trueman;* for until after the death of *Henry Trueman,* he never set up any claim to the land, and then only under the fraudulent pretension of the deed being defective.

Having established the possession in the complainant's ancestors, and connecting it with the other evidence, it fully entitles us to the aid of equity on the second ground of relief.

I have proved the will of *Thomas Trueman*, the original purchaser, stating that he had bought the land, and paid for it, devising it to *James* his son. I have proved a deed under the hand and seal of *Edward Trueman*, the vendor of the land, acknowledging payment from the devisor, intending by that deed to convey the land to the devisee in the will. I have proved a continued possession in the heirs of the party claiming under the will for more than half a century; and it is humbly presumed that all this fully establishes a contract wholly performed, except the legal execution of a deed, and such a one in which a court of chancery will decree a specific performance.

3. The *third point*. That there has been a submission and award in favour of the complainants.

As to this point, the decree states that there is not the least colour for relief; *first*, because chancery will not decree a specific performance of an award; and *secondly*, because no award is produced.

As to the fact of the arbitration bond and award. The bill states a bond in *hæc verba*, which is admitted by the answer. The bill also states an award by *Sim*, *Bowie* and *Tubman*. The answer does not admit that the award was made by all three of the arbitrators, but states that the defendant believes such award was made by *Sim* and *Bowie*. No principle is better established than that it is not necessary to prove what is admitted by the parties in their pleadings. If a deed is admitted, it need not be proved or produced; as on a plea of payment to a bond, it is never necessary to produce or prove the bond. In this case, therefore, it was not necessary to produce the bond, because its existence was admitted; nor was it essential to produce the award, because the award is admitted to have been made and signed by *Sim* and *Bowie*, which is enough for our purpose.

It is stated, both in the bill and answer, that *Charles S. Smith* was, by consent of both parties, not to act; the remaining three then must necessarily have been the arbitrators. In fact, *Sim* and *Bowie* alone signed the award; but it is proved in the case, that any two were to make the award.

*James Trueman* proves, that the arbitrators were *Joseph Sim*, *Henry Tubman*, and *William Bowie*, and any *two* of them; and that *Sim* and *Bowie* awarded in favour of *Thomas Trueman*.

*William Bowie*, one of the arbitrators, proves, that the arbitrators met and went on with the business with the assent of the parties, and signed the award in favour of *Thomas Trueman*.

The depositions of *James* and *Alexander Trueman* both prove the award made by *Sim* and *Bowie* in favour of *Thomas Trueman.*

Thus, then, by the admission of the answer, and the testimony in the cause, the existence of the award for the land in dispute is fully proved to have been made by the two arbitrators; although the defendant admits the existence of the bond, yet he wishes to avoid it by duress, but in this the falsity of his answer is complete-ly established by evidence.

It may be proper to remark, that all the prolix histo-ry of the oppression of *John Perrie,* is wholly out of the question, because it is stated in the answer to have happened before the execution of the bond, and has no connexion with the case; the evidence of the execution is now to be considered.

*William Bowie* proves, that the arbitrators met and went into the business with the *assent* of the parties.

*James Trueman* proves, that he was on the land when *Benjamin Trueman* took possession. That *Benjamin Trueman* was the first person who proposed referring it, and that *Thomas Trueman* agreed to it. That *Benjamin Trueman* agreed to pay 600lbs. of tobacco rent, if it was adjudged against him, and gave a twist of tobac-co as an acknowledgment.

*Alexander Trueman* is of opinion, that *Benjamin Trueman* entered into the bond voluntarily; that he agreed to pay 600lbs. tobacco if it was determined against him.

These three depositions certainly prove that the an-swer of the defendant is untrue in this particular. In-deed, the chancellor in his decree does not even hint that the reference was to be suppressed on the ground of *duress,* but refuses to aid on the ground that a speci-fic performance of an award will not be decreed, unless on the ground of a subsequent assent.

It is difficult to tell what is the rational ground of dis-tinction, as to this purpose, between a bond conditioned to convey land, if arbitrators chosen by the parties shall so award, and a bond conditioned to convey land upon the payment of a sum of money, or the doing a certain act; why in the latter case a performance will be de-creed, and not in the former, even when the party to convey has attained some valuable purpose by the arbi-trament, as the settling of a difference, or the release of a debt.

The reason why applications to the court of chancery have been unfrequent on subjects of this nature, arises from this, because the matter of an award is generally of a personal nature, as the payment of money, which

JUNE, 1797.

Somerville
vs.
Trueman.

is proper to be sought for in a court of law; but I have not been able to find any adjudged case where the court has determined that they would not decree the specific performance of an award for the conveyance of land, where the party is ready to perform every thing on his part to be done.

There are many instances in which a court of chancery has decreed the performance of an award. I will state a few. *Pooke and Pipe*, 3 *Cha. Rep.* 20. An *ancient* award respecting a term of 500 years, which was performed by one of the parties, was decreed to be assigned. In the case at bar the land being ours we had nothing to do on our part; the only act to be done was a conveyance to be made by the defendant, and seems to come within the principle of the case cited. 2 *Vern.* 25, *Norton and Mascal*. There was an award not binding in form of law. The party made a tender, but there was no other execution on his part, and the court decreed a specific performance. *Hall and Hardy*, 3 *P. Wms.* 187 *to* 190. It is mentioned by the author that decrees to compel performance of awards are uncommon, because they are generally for payment of money; but when the award is to convey an estate, &c. if the defendant has accepted what is awarded in lieu of the estate awarded, it is proper to decree a performance.

If there is a bond to secure the performance of the award, and a suit is brought for the penalty, a court of chancery will relieve against the penalty, on the conveyance of the estate awarded; and surely on principles of reason and equity, the party to whom an estate is awarded ought to have a right to apply directly to the court of chancery for a specific performance of the award, where the opposite party may apply to that court, and gain relief, on his conveyance of the estate awarded.

However it seems universally admitted, that if the party assents to an award he may be compelled to perform it; but the decree states there is no evidence of an assent. We will examine it. An assent is a fact which may be collected from evidence, and there is no doubt but that this assent may as well be implied as express.

It is stated in the bill, and not contradicted in the answer, that the award was made about the year 1771, in favour of *Thomas Trueman*. The deposition of *William Bowie* also confirms it in a great degree. Hence we may conclude the fact to be so, as in truth and reality it was. And it is also established, that the heirs of *Thomas Trueman* has been in possession of the land, claiming title to it ever since, until the filing the bill in 1785, which is a period of 14 years.

This I think is a very sufficient evidence of an assent to the justice of the award, not forgetting that *William Bowie* proves that the business was entered into by the assent of the parties; and that *Benjamin Trueman* urged the arbitrators to a settlement of the business.

It is therefore submitted, whether on the ground of the award, and 14 years continuance in possession afterwards, the party was not entitled to a decree in his favour in the court of chancery.

4. The *last point* remains to be considered, whether the lapse of time will prevent a recovery?

It must be observable that all acts of limitations respecting rights to land, and decisions of courts of equity in analogy to them, have been to protect men's *possessions*, and only have operation when men are out of possession. And the chancellor in his decree seems to admit, that if we prove a contract, and an uniform possession under it, that then length of time will be no objection to our recovery; but he doubts the sufficiency of the evidence to those points.

The period which courts of equity have fixed on, beyond which they will not disturb a possession under a legal title, by decreeing performance, seems to be 20 years, at any rate not a shorter time. 2 *Eq. Ab.* 576, *Stone vs. Stone.* Possession for more than 20 years, under legal title, will not be disturbed in equity.

1 *Eq. Ab.* 306. 2 *Vern.* 127. *Scolefield and Whitehead.* A bill for specific performance of a covenant was dismissed where the opposite party was in possession 60 years.

But in these cases, and all others on the subject, to prevent the party from a specific performance, it is necessary that the opposite party should be in possession, in which case a neglect to apply for performance will be considered as a dereliction of the right.

In a bill of this nature there is great resemblance to bills to redeem, as to length of time. If the mortgagor is in possession of the property, or even of a part of it, he may redeem at any time.

*Select Cases in Cha.* 55, 2 *Eq. Ab.* 602 *(n.)* It was agreed, that where the mortgagor is in possession of any part of the land, length of time shall never affect him; and that the computation of time shall only commence from when the mortgagee got possession of the whole.

In the present case the party applying for a performance has always had possession of the greater part; for the defendant himself only states a possession of part; and consequently we come within the case cited.

But the defendants have never had possession of any part of the land a sufficient time to bar a recovery; to prove which it will be necessary to have recourse to the

papers. The answer states, that *Benjamin Trueman* took possession of part in the year 1770; the bill in this case was filed in the year 1785; so that only 15 years elapsed before this suit was brought; and no authority can be produced to prove that 15 years has been sufficient to bar a recovery of this nature. However, the party was not idle during that time, because in the year 1771 he had an award in his favour; and in the year 1778 he gained possession by legal course, viz. by the finding of a jury, and the judgment of two justices sitting on a warrant of forcible entry.

From these observations it is contended that the lapse of time will not bar a recovery in this case. Upon all the different grounds of relief it is presumed the appellants are entitled to a decree in their favour; and from the great importance of the cause to them, I have been induced perhaps to travel further into the business than was necessary. They are not searching into antiquated titles for the purpose of harrassing their neighbours, but are only defending their possessions, which has been handed down to them from their ancestors in a succession of 80 years. It is the appellees who, by bringing an ejectment at law, have attempted to defeat the solemn act of their ancestor, and even to set aside the award of men of respectability and character, chosen by themselves.

THE COURT OF APPEALS [RUMSEY, Ch. J. MACKALL and JONES, J.] *Reversed* the decree of the court of chancery, and decreed, that the chancellor pass and make a decree, directing that the appellees duly execute a deed or deeds of conveyance, to be acknowledged and recorded according to law, thereby conveying to the appellant, *James Somerville*, for life, with remainder in fee to the other appellants, as tenants in common, all the right, &c. of the said appellees, respectively, of, in and to, all those parts of two tracts or parcels of land called *"Blackwell,"* and *"Thomas and Anthony's Choice,"* described and included within the limits and courses of the deed heretofore executed by *Edward Trueman* to *James Trueman*, exhibited in the bill of complaint; and also decree a perpetual injunction, &c. &c.